ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2007 OCT 26  P 3: 55

CLERK _C.Adams_
SO. DIST. OF GA.

United States ex rel.              )
JOSEPH TESTINO,                    )
                                   )        Civil Action No. **CV107- 146**
        Plaintiff-Relator,         )
                                   )        **FILED IN CAMERA AND**
        v.                         )        **UNDER SEAL**
                                   )
AUGUSTA MEDICAL SYSTEMS,           )        Jury Trial Requested
L.L.C. and JULIAN OSBON,           )
                                   )
        Defendants.                )

# SEALED AND IMPOUNDED

## COMPLAINT

1.

This is a *qui tam* action by Plaintiff-Relator Joseph Testino ("Relator"), for himself and on behalf of the United States, to recover damages and civil penalties arising from Defendants' actions in violating the False Claims Act, 31 U.S.C. § 3729-3733. As set forth below, Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval to the United States; knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved; and conspired to defraud the Government by getting false or fraudulent claims allowed or paid.

Jurisdiction and Venue

2.

This action arises under the False Claims Act, 31 U.S.C. § 3729-33.

3.

Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a), 31 U.S.C. § 3730(h), and 28 U.S.C. § 1331, in that this action arises under the laws of the United States.

4.

Venue is proper in this district under 31 U.S.C. § 3732(a). At least one of the Defendants can be found, resides, or transacts business within the district, and many of the acts forming the basis of this action occurred within the district.

The Parties and Related Entities

5.

Defendant Augusta Medical Systems, L.L.C. ("AMS") is a Georgia limited liability company, with its offices at 1025/1027 Broad Street, Augusta, Georgia. AMS manufactures and sells products for the treatment of erectile dysfunction, including vacuum erection pumps. A large portion of AMS's revenues comes from Medicare payments.

6.

Defendant Julian Osbon ("Osbon") is a resident of Georgia, and at all times material to this complaint was the CEO and owner of AMS. Osbon subsequently transferred ownership of AMS to his son, Michael Osbon.

7.

Soma Blue, Inc. ("Soma Blue") was a Georgia corporation that manufactured and sold products for the treatment of erectile dysfunction, including vacuum erection pumps. Soma Blue was owned and controlled by Julian Osbon.  Soma Blue went out of business in late 2002, and all of its assets were transferred to AMS, which continued operating the same business out of the same location.  Soma Blue filed its last annual registration with the Georgia Secretary of State on June 24, 2002, and was administratively dissolved by the Secretary of State in July 2005.

8.

Relator is a resident of Georgia, and was employed by AMS from July 2003 to October 2005, first as Director of Corporate Development, then as National Sales Manager.

## Medicare Payments for Durable Medical Equipment

9.

In order to receive payment from Medicare for items of durable medical equipment ("DME"), a supplier must comply with numerous conditions, including those set forth in 42 C.F.R. § 424.57.  Among other things, a supplier must have submitted a completed application to CMS to furnish Medicare-covered items, and must have received a DMEPOS supplier number.

10.

In order to obtain a supplier number and Medicare billing privileges, a supplier must meet certain standards, and must certify that it meets and will continue to meet such standards, including but not limited to the following:

(i)      it must operate its business and furnish Medicare-covered items in compliance with all applicable Federal and State licensure and regulatory requirements;

(ii)     it must not make any false statement or misrepresentation of a material fact on its application for billing privileges;

(iii)    it must fill orders from its own inventory or by contracting with other companies for the purchase of items necessary to fill the order, and must provide, upon request, copies of contracts or other documentation showing compliance with this standard;

(iv)    it must maintain a physical facility on an appropriate site, with space for storing business records including the supplier's delivery, maintenance, and beneficiary communication records;

(v)     it must maintain a primary business telephone listed under the name of the business locally or toll-free for beneficiaries, and must furnish information to beneficiaries at the time of delivery of items on how the beneficiary can contact the supplier by telephone;

(vi)    it must have a comprehensive liability insurance policy in the amount of at least $ 300,000 that covers both the supplier's place of business and all customers and employees of the supplier;

(vii)   it must be responsible for the delivery of Medicare covered items to beneficiaries and maintain proof of delivery, and must document that it or another qualified party has provided beneficiaries with necessary information and instructions on how to use Medicare-covered items safely and effectively;

(viii)  it must answer questions and respond to complaints a beneficiary has about the Medicare-covered item that was sold or rented, and must maintain documentation of contacts with beneficiaries regarding complaints or questions;

(x)     it must maintain and replace at no charge or repair directly, or through a service contract with another company, Medicare-covered items it has rented to beneficiaries;

(xi)    it must accept returns from beneficiaries of substandard items;

(xii)   it must comply with the disclosure provisions in 42 C.F.R. § 420.206;

4

(xiii)   it must not convey or reassign a supplier number;

(xiv)   it must have a complaint resolution protocol to address beneficiary complaints and keep at its physical facility written complaints, related correspondence and any notes of actions taken in response to written and oral complaints;

(xv)   it must be accredited by a CMS-approved accreditation organization in order to receive and retain a supplier billing number;

(xvi)   it must notify the accreditation organization when a new DMEPOS location is opened; and

(xvii)   all DMEPOS supplier locations, whether owned or subcontracted, must meet the DMEPOS quality standards and be separately accredited in order to bill Medicare.

<u>Defendants' False and Fraudulent Actions</u>

11.

In 1983, Julian Osbon formed a company known as Osbon Medical Systems to market vacuum devices for erectile dysfunction.  In 1995, Osbon sold Osbon Medical Systems to UroHealth Systems, Inc.  UroHealth Systems, Inc. subsequently sold the Osbon Medical System assets to Timm Medical Technologies, Inc. ("Timm").

12.

Subsequently, Osbon formed a new company, Soma Blue, which operated in the same industry.  A Medicare supplier number was issued to Soma Blue, which had its physical facility at 1025 Broad Street, Augusta, Georgia.  Soma Blue submitted DME claims to Medicare for its erectile dysfunction products.

13.

In December 1999, Timm filed a lawsuit against Osbon, Soma Blue, and other Osbon-owned companies for trademark violations, false advertising, and unfair competition.  Among other things, Timm asserted that Soma Blue was improperly using Julian Osbon's name in marketing efforts.  The claims against Osbon individually were

dismissed, while the claims against the company defendants continued. On January 15, 2002, the court entered partial summary judgment in favor of Timm. On October 29, 2002, following a jury trial, the court entered a monetary judgment against Soma Blue and the other defendants. In addition, the court entered a permanent injunction prohibiting SOMA Blue and the other defendants from using Julian Osbon's name in certain ways.

14.

In November 2002, in an apparent effort to avoid legal obligations to creditors, Osbon formed AMS, and transferred all of Soma Blue's assets to AMS. Soma Blue ceased doing business, and Osbon began operating the same business under the name of AMS.

15.

In or around November 2002, Osbon attempted to obtain a Medicare supplier number for AMS, upon information and belief using the address 1027 Broad Street. Upon information and belief, when Medicare inspected the premises, they noticed that it was the same premises previously used by Soma Blue, with the 1027 address number placed above another entrance door. Medicare declined to issue a supplier number to AMS at that time

16.

Because AMS did not have a Medicare supplier number, and thus lacked Medicare billing privileges, AMS and Osbon engaged in a scheme to deceive Medicare in order to receive millions of dollars of Medicare payments to which they were not entitled. For approximately a year or more, AMS submitted claims to Medicare under the name

6

and provider number of Soma Blue.  When patients would be given an Assignment of Benefits ("AOB") form to sign, the form would state "I authorize Soma Blue to receive payment ..." rather than "I authorize Augusta Medical Systems to receive payment ...." Relator asked Melissa Mundy, an AMS employee, about the AOB forms, and was told that they were in transition and waiting on the AMS supplier number.

17.

Although claims were submitted to Medicare under Soma Blue's name and provider number, all products and services were provided by AMS, and the company marketed itself and held itself out to the public as AMS.  When Medicare checks to Soma Blue arrived in AMS's office, they would be deposited into AMS's account.

18.

Although claims to Medicare were submitted under Soma Blue's name, claims to other entities were submitted under AMS's name.  In late 2003, Relator was in Jan Pruitt's (AMS's bookkeeper's) office and saw one stack of insurance checks made out to Soma Blue, and another stack of checks from pharmacies made out to AMS.

19.

During late 2003, as National Sales Manager, Relator participated in weekly meetings with Julian Osbon and others.  A frequent topic of discussion in these meetings was the urgency of obtaining a Medicare number for AMS.

20.

In late 2003, Osbon hired movers to move all of Soma Blue's Medicare files out of the building.

7

21.

Upon information and belief, AMS received its own Medicare number around February 2004.  Relator had a discussion with Melissa Mundy around this time, and she excitedly informed him that AMS "officially" had its Medicare number.  Around this time, the AOB forms were changed to indicate that the right to receive payment was assigned to AMS, not Soma Blue.

22.

Because AMS did not have a Medicare supplier number, it was prohibited from submitting claims to Medicare.  By submitting claims under Soma Blue's name and number, AMS falsely represented that the products and services had been provided by Soma Blue, which was no longer in business.  Accordingly, every claim submitted by AMS to Medicare under Soma Blue's Medicare number constitutes a false claim.  Moreover, because Soma Blue was not in business and did not exist as an operating company, it failed to satisfy any of the Medicare conditions of participation, and was ineligible for participation in the Medicare program.

23.

All actions described herein were undertaken with the knowledge of, and at the instruction of, Julian Osbon.

## COUNT I
## FALSE CLAIMS

### 24.

The allegations in the preceding paragraphs are incorporated by reference.

### 25.

Defendants violated the False Claims Act in that they:

(1)     knowingly presented or caused to be presented numerous false claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1);

(2)     knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2); and

(3)     conspired to defraud the Government by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3).

### 26.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself and the United States, prays:

(a)     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of 31 U.S.C. § 3729;

(b)     That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more

than 25 percent of the proceeds of the action or settlement of the claim if the United

States intervenes, and not less than 25 percent nor more than 30 percent of the proceeds

of the action or settlement of the claim if the United States does not intervene;

(c)     That Relator be awarded all costs and expenses incurred, including reasonable

attorneys' fees; and

(d)     That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

David B. Bell
Georgia Bar No. 047750
Bell & Bell
P.O. Box 1011
Augusta, GA 30903
(706) 724-1882
(706) 722-2507 (fax)
davidbell@davidbelllawfirm.com

Michael A. Sullivan
Georgia Bar No. 691431
Finch McCranie, LLP
225 Peachtree St., Suite 1700
Atlanta, Georgia 30303
(404) 658-9070
(404) 688-0649 (fax)
msullivan@finchmccranie.com

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
165 North Main Street
Jonesboro, GA 30236
(678) 610-1994
(678) 302-8721 (fax)
mark@marksimpsonlaw.com
Attorneys for Plaintiff-Relator

10